UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10228-GAO

COASTWISE PACKET COMPANY,
Plaintiff,

v.

BOOTHBAY HARBOR SHIPYARD LLC,
Defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER FOR JUDGMENT
March 30, 2012

O'TOOLE, D.J.

The plaintiff, Coastwise Packet Company, brought suit against the defendant, Boothbay Harbor Shipyard, for damages arising from Boothbay's defective workmanship on the Shenandoah, a vessel owned by Coastwise. The Court conducted a thirteen-day bench trial on the plaintiff's claims of breach of contract (Count I), breach of express warranty (Count IV), and fraud and misrepresentation (Count VII). After trial, the parties each submitted proposed findings of fact and conclusions of law and each presented closing arguments. Having considered the evidence and arguments of the parties, the Court now finds and concludes as follows.

## I. Findings of Fact

The Shenandoah is a one-hundred-eight-foot topsail schooner built in 1964. By 2007, the vessel was used primarily for week-long charters during the summer season. She was built of red oak, with oak frames and planks. These planks were fastened to the frames with long metal nails, and the fastening holes were plugged with wooden bungs and sealed. Cotton and oakum were driven into the seams of the planking and were then topped with seam compound.

In the spring of 2007, after an inspection, the Coast Guard ordered that the vessel undergo a refastening program to check for defects in the existing fasteners and repair and replace as necessary. Soon afterward, in accordance with the Coast Guard's order, 25% of the frames on the hull planking below the waterline were refastened at D.N. Kelley's Shipyard in Fairhaven, Massachusetts. The Coast Guard also required replacement of some topside planks which contained polyester resin patches in areas of previous rot.

In November 2007, Coastwise and Boothbay entered into a written agreement, the Shipyard Restoration Agreement, in which Boothbay agreed to perform work which included retopping the vessel and refastening the 75% of the frames not addressed at D.N. Kelley's. Among other things, their agreement provided that, subject to various qualifications, Boothbay "covenants and agrees that all work performed and materials used shall be free from all defects, and that all work shall be performed according to accepted boatbuilding practices." (Pl.'s Ex. 3.) It further provided that, upon completion of Boothbay's work, "Owner or his agent shall thoroughly inspect the Vessel and, upon such inspection, Owner agrees to accept delivery and to furnish his written acceptance of the Vessel, in form reasonably requested by Shipyard." (Id.)

In December 2007, the vessel was hauled on a railway at Boothbay Harbor Shipyard in Maine. Capt. Robert Douglas from Coastwise periodically visited the shipyard to observe the on-going work on the vessel, and the U.S. Coast Guard regularly inspected the vessel. To reduce the expense of the refastening project, the parties agreed with Coast Guard approval to leave old fasteners in place, and rather to drill new fastener holes, install new fasteners in those holes, and bung the holes afterward. Boothbay used not only marine epoxy but also PL Premium for sealing the bungs.

During the vessel's overhaul, various issues arose. Capt. Douglas observed instances of poor workmanship which Boothbay addressed. Materials took a significant amount of time to

2

arrive at the shipyard. The project manager, David Stimson, was reassigned to a different project in Rhode Island before the work on Shenandoah was completed. Some of the workers may not have been adequately trained or experienced for the jobs they were asked to do. The scope of work expanded as additional parts of the vessel were discovered to need repair. There was pressure to complete the work in time for the beginning of the vessel's operating season in the summer. As Stimson later wrote, Boothbay was attempting to do nine-month's worth of work in a six-month period.

Capt. Douglas expressed his dissatisfaction with a number of aspects of the repair. In response, Boothbay reduced its final charge by more than $100,000. In total, Capt. Douglas paid Boothbay $700,000 and signed a promissory note in the amount of $200,000 for the balance. Capt. Douglas accepted the vessel and towed it to Massachusetts.

In June 2008, soon after being placed back in service, the vessel began to leak a significant amount of water. The leaking was far greater than it had been before the overhaul at Boothbay. Coastwise brought the vessel to Fairhaven Shipyard to investigate and repair the leaking. After certain repairs were made, the vessel was soon relaunched. The leaking continued, though at a tolerable level for the remainder of the summer season.

In October 2008, the vessel returned to Fairhaven for a rehauling and investigation. Water was seen dripping from bungs on planks below the waterline, and empty fastening holes were discovered beneath removed bungs. The vessel was recaulked and relaunched to make room on the railway and, soon afterward, was rehauled at Fairhaven for further inspection. Boothbay personnel came to inspect the vessel. They acknowledged that Boothbay had performed defective workmanship on the vessel, and Doane Heselton, Vice President of Boothbay, proposed to fix the problems at Boothbay Harbor Shipyard at no cost to Coastwise.

3

Capt. Douglas, dissatisfied with the work Boothbay had done, refused to have the vessel brought back to Boothbay and instead chose to have her repaired at Fairhaven. He demanded that Boothbay pay for the repairs based on estimates of the repairs' projected costs as estimated by Fairhaven. Boothbay refused to write Coastwise a "blank check" for repairs performed at Fairhaven but did offer to pay a lump sum of $208,000 and, later, $215,000 to cover costs to repair the vessel. These offers were rejected.

From October 2008 until June 2009, Fairhaven identified numerous defects in Boothbay's workmanship. It found, among other things, missing bungs, empty fastener holes, improperly installed fasteners, use of an improper sealant, overly wide caulking seams, poorly installed caulking, and too-short futtock overlaps. The Coast Guard directed that the fasteners (excepting the ones installed at D.N. Kelley's) be inspected and, if necessary, be replaced or repaired.

Fairhaven repaired Boothbay's defective work and also conducted repairs that were beyond the scope of the contract between Coastwise and Boothbay. Fairhaven sought to determine what tasks at Fairhaven addressed defective work of Boothbay by keeping on-going records which recorded the hours worked, the materials used, and the kind of work performed according to a set of job codes.

In January 2009, Coastwise filed suit in state court against Boothbay on a number of legal theories, and the case was subsequently removed here.

## II.      Conclusions of Law

As announced in open court, the evidence at trial failed to support a claim for fraud and misrepresentation. More specifically, the evidence did not demonstrated by clear and convincing evidence that Boothbay made specific representations about the skill of the shipwrights who would perform all of the work on the vessel; it demonstrated, moreover, that Capt. Douglas

decided to have Boothbay work on the vessel because he generally believed the shipyard was qualified and able to do the work, but not because of specific representations of quality made by Boothbay. See Flaherty v. Muther, 17 A.3d 640, 654 (Me. 2011).

On the remaining claims, the defendant already has admitted liability for its defective work and, therefore, for breach of contract and breach of warranty. The question now remaining is the scope and extent of that liability.

To assess the scope and extent of Boothbay's liability, one first must consider the reliability of Fairhaven's record keeping regarding the work performed at its shipyard to fix the defects created or left by Boothbay. Having reviewed the records and considered the relevant testimony, I credit the Fairhaven records as being substantially accurate. They represent a good faith effort to categorize and memorialize the work performed at Fairhaven; they are relatively detailed in the information collected; they were created on an on-going basis throughout the work period; and they were created by Fairhaven, not a party in this case, in what appears from the evidence to have been a good-faith effort accurately to document the repairs performed at their shipyard.

A second preliminary question involves the proper rates to be charged for the repair work performed. Boothbay argues that its own rates should apply because it offered to fix the vessel itself at no additional charge. Coastwise, however, was not obligated at this point to return its vessel to the very shipyard that had caused such extensive defects in the first place. To ensure that Coastwise is put in the position it would have been in but for the breach of contract here, Boothbay is held liable for the costs that a comparable shipyard would reasonably charge for the work performed to repair the defective work performed by Boothbay. See Anuszewski v. Jurevic, 566 A.2d 742, 743-744 (Me. 1989). Having considered the evidence, I find that

5

Fairhaven is such a comparable shipyard and that the prices it charged for services and material were reasonable given the work performed.

### A. Fasteners

Boothbay is liable for the costs associated with the replacement of fasteners that it installed (job code C100). Boothbay acknowledged defective workmanship in this area, and these repairs were necessary to place Coastwise in the position it would have been in but for Boothbay's defective work. Boothbay is also liable for the reasonable costs associated with this work and, explained below, the seam compound work; as a result, there was no harm in Fairhaven's coding of such work under the same job code as the one for replacing Boothbay's fasteners. For job code C100, Boothbay is liable for $263,192.60.

Boothbay is not liable for the costs of replacing old fasteners (job code C180). These fasteners were with the vessel before it was hauled at Boothbay. Their condition may have required their removal, but Boothbay is not responsible for their condition. It would be an unwarranted windfall to award Coastwise costs for replacing these fasteners.

### B. Planking

Boothbay is liable for the costs associated with the replacement of planks coded as "warranty planking" (job code C105). An inspector of the U.S. Coast Guard ordered that these planks, installed by Boothbay, be replaced because, for example, caulking seams were too wide to caulk and planks were too damaged from fastener work. Boothbay accepts liability for the planks damaged from fastener work. As for planks whose seams were too wide, an inspection of the vessel may have revealed that certain seams were wider than others; the evidence, however, has not shown that such an inspection would have revealed the fact that such seams would be too wide to caulk. The evidence indicates that Boothbay's work in this area was deficient. For job code C105, Boothbay is liable for $61,041.17.

### C. Frames

Boothbay is not liable for the costs associated with the replacement of frames (job code C160). The evidence does not demonstrate with sufficient convincing clarity that these frames were in need of replacement because of defective work by Boothbay as opposed to some other reason. Of further importance is the fact that Coastwise failed to create job codings to distinguish the frames removed because of any defective work allegedly attributable to Boothbay (for which Coastwise claims damages) as opposed to the frames removed for other reasons such as rot (for which Coastwise does not claim damages). For instance, there was evidence that some frames had to be replaced because they had rotted. Those replacements are not chargeable to Boothbay. It is not sufficiently clear how much work, if any, can be attributable to Boothbay's defective workmanship. The plaintiff has not sustained its burden of proof as to this item of claimed damages.

### D. Caulking and Hauling

Boothbay is not liable for the costs associated with hull recaulking work done in October 2008 (job code C135). After the vessel was first hauled to inspect for purposes of assessing the leaking, it had to be relaunched so that Fairhaven could put another vessel on the railway. This was done for Fairhaven's convenience, and should not be chargeable to Boothbay. It would only be chargeable to Boothbay if it were proven that the recaulking for the interim relaunch was work that ultimately would have been done anyway and then properly charged to Boothbay. The evidence was insufficient to establish that point, and in the absence of reliable evidence, the burden as to this element has not been met by the plaintiff. Boothbay is liable for the costs associated with the warranty caulking (job code C112). Apart from the seams, some of which were too wide, Boothbay often included insufficient oakum and improperly horsed-in caulking. Having considered the extensive nature the caulking deficiencies, I find that the extensive

recaulking at Fairhaven was necessary to ensure that Coastwise was placed in the position it would have been in but for Boothbay's defective work. It is not necessary to prove the need for recaulking seam by seam. The defective work was pervasive enough that it was reasonable to redo all the topside caulking as a precaution against future failures. For job code C112, Boothbay is liable for $56,559.88.

Boothbay is not liable for costs associated with replacement of the coverboard caulking. The evidence presented of costs for repair are too speculative to award damages.

### E. Haulings

But for Boothbay's defective workmanship, the haulings would not have been necessary. Boothbay is, for job code H200, liable for $2,644.81 and, for job code H210, liable for $4,440.46.

### F. Washing and Painting

Boothbay is liable for the costs associated with the pressure wash (job code P200) and painting of the bottom (job code P205) and hull (job code P220). This work would not have been necessary but for Boothbay's defective workmanship and the need for subsequent repairs. Boothbay is, for job code P200, liable for $1,921.35; for job code P205, liable for $5,950.84; and for job code P220, liable for $4,379.32.

### G. Topside Strake

Boothbay is not liable for replacement of the topside strake. The costs associated with such a replacement are too speculative. In any event, the defendant demonstrated an accord and satisfaction here, where the evidence sufficiently indicates that Capt. Douglas saw the particular imperfection here before acceptance of the vessel and negotiated a reduction of over $100,000 from the original price of repairs for deficiencies observed in the vessel.

8

### H. Diminution of Value

Boothbay is not liable for the alleged diminution of the vessel's value. The plaintiff has not reliably demonstrated the pre-Boothbay value of the vessel, a key benchmark in determining the alleged diminution in value here. The plaintiff has not sustained its burden to recover.

### I. Layfield's Fees

Boothbay is not liable for paying Dennis Layfield. His expertise primarily aided in preparation for litigation. It was not the sort of expertise for which fees are generally recoverable in breach-of-contract cases such as the present one.

### J. Living Expenses

Boothbay is not liable for the expenses incurred by Capt. Douglas during his oversight of repairs at Fairhaven. The evidence does not demonstrate that, absent Boothbay's breach, Capt. Douglas would have spent no money on, for example, dry cleaning and food, although Coastwise here seeks recovery for both of these costs. Recovery of such costs by Capt. Douglas and Coastwise would place them in a position better than the one they would have been in absent Boothbay's breach. While it may be fair for Boothbay to be liable for the costs clearly and closely associated solely with oversight of repairs, it is not clear from the bills submitted what items fall squarely into this category. The plaintiff has not sustained its burden.

### K. Interest on Loan

Boothbay is not liable for the interest on loans taken out to pay for the repair to the vessel. It was Coastwise's choice to finance the repairs in this manner, and pre- and post-judgment interest will compensate Coastwise for the interest to which it is entitled.

### L. Set Off

From the damages it must pay, Boothbay will receive a $200,000 set off for the unpaid promissory note signed by Coastwise in that amount. The gross amount of damages is

$400,130.43. The set off is $200,000. The net amount is therefore $200,130.43. Prejudgment interest will be applied to this amount.

### M. Fees and Costs

No attorneys fees shall be awarded. Each side shall bear its own costs.

### N. Affirmative Defenses

The discussion above applies the concepts of ratification, mitigation, and accord and satisfaction where appropriate. A wholesale exclusion of remedy based on any of these concepts is unwarranted here.

### O. Interest

Prejudgment interest will be 3.4% per annum, which is the one-year United States Treasury bill rate for the last full week of the calendar year immediately prior to the year in which prejudgment interest begins to accrue plus the 3% per annum rate required by Maine law. Me. Rev. Stat. tit. 14, § 1602-B(3). The 3.4% prejudgment interest rate thus shall be applied to $200,130.43. Interest accrues from January 22, 2009, the date when the Complaint was filed. See id. Accordingly, Boothbay is liable to Coastwise in the sum of $221,811.41 as of the date of judgment.

## III. Conclusion

Judgment shall enter in the plaintiff's favor in the sum of $221,811.41.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge